Hinkle, Margaret R., J.
In this action, plaintiff Sun Microsystems, Inc. (“Sun”) alleges breach of contract and violations of General Laws Chapters 176D and 93A against St. Paul Fire and Marine Insurance Company (“St. Paul”) in connection with a claim Sun submitted under an all-risk insurance policy which St. Paul issued to defendant Electronic Services, Inc. (“ESI”). In a Memorandum of Decision and Order dated July 16, 2007, this Court (van Gestel, J.) ordered that Sun and St. Paul submit to an appraisal procedure set forth in the relevant insurance policy. That provision states that in the event of a disagreement between two appraisers as to the amount of the covered loss, an umpire will select one appraisal as his award in a process known as “baseball arbitration.” In a June 16, 2008 decision, the court-appointed umpire selected an appraisal of $512,981 as determinative of the covered loss amount. This matter is before the court on Sun’s motion to vacate the umpire’s decision. For the reasons discussed below, after a hearing, Sun’s motion is denied.
BACKGROUND
Sun is a re-manufacturer of used computer hardware. In November of 2002, Sun entered into a contract with ESI in which ESI served as a bailee to store Sun’s computer equipment at its facility in Hudson, Massachusetts and re-manufacture it for resale by Sun. Defendant Sullivan Insurance (“Sullivan”) is an agent for St. Paul and has authority to bind St. Paul to contracts of insurance. ESI hired Sullivan to evaluate the necessary insurance coverage for its business activities, and Sullivan procured an all-risk insurance policy issued by St. Paul for the time periods at issue in this case. Sun was a named loss payee under the policy, which included $42,000,000 of blanket combined building, personal property and business income coverage for scheduled locations. It is undisputed that the policy which issued each year did not physically include Form F0180, St. Paul’s standard first-party property coverage form which contains numerous exclusions.
In March and April of 2004, ESI transferred multiple truckloads of Sun equipment to the Marlborough warehouse, a 9,000-square-foot prefabricated uninsulated and unheated metal building which is approximately 75 years old. The walls of the Marlborough warehouse are composed of a formed rolled metal ribbed siding which is attached to the structural frame with fasteners. The side and end laps of the roof were sealed with a bituminous product that cracked and offers little waterproofing protection. The lower portion of the wall panels contain multiple open side laps, as well as holes in the paneling where pipes or electrical conduits have been removed. There are multiple holes in the windows. There are also voids between the doors and doorframes, and siding near the doors has become separated from the frame of the building. There are *342 gaps between the floor slab and the siding. The eaves are open at the top of the sidewalls, and there are multiple holes in the roof and signs of water corrosion where the roof meets the sidewall openings at the gable ends. The corrugated metal peaked roof is rusted and provides little or no water and moisture protection.
In August of 2004, Sun learned that some of its equipment was stored in unauthorized locations. Suspecting theft, Sun requested that the FBI investigate the situation. By letter dated December 17, 2004, ESI notified Sullivan of potential losses suffered by Sun which “appear to arise from potentially criminal conduct on the part of one or more employees” of ESI. ESI’s letter stated that the FBI was investigating one or more schemes of theft of Sun equipment in ESI’s possession. Sun undertook a physical inventory of all the diverted equipment to establish the nature of the equipment stored in off-site warehouses and to investigate the value of Sun’s claim against ESI for diversion of the equipment. Sun presented claims for its losses to St. Paul. According to inspection and testing performed by LWG Consulting, which was hired by St. Paul and ESI, 40.3% by dollar value of the equipment stored in the Marlborough warehouse failed functionality testing or showed visible signs of staining, corrosion or other damage. However, Sun’s position is that all the equipment stored in Marlborough was exposed to the “risks of direct physical loss or damage” within the meaning of the policy issued by St. Paul and is now valueless because Sun cannot vouch for its functional and electronic integrity and therefore cannot sell it.
Sun filed this action against ESI, Sullivan, and St. Paul on July 11, 2005. Sun alleges breach of contract, negligent bailment, conversion, negligent misrepresentation and violations of G.L.chapter 93A against ESI; breach of contract, negligence and negligent misrepresentation against Sullivan; and breach of contract and violations of G.L.chapters 176D and 93A against St. Paul.
On March 3,2006, St. Paul processed Form D0061, a “Policy Change Endorsement,” adding Form F0180, “Technology Premier Property Protection,” to all years in which the policy had issued to ESI. Form D0061 states that the endorsement is effective on March 7, 2003. Form D0061 states “How Your Policy Is Changed,” and the box “Coverage Forms and Endorsements” is checked off with the notation, “is (are) changed to read: (See also back page and additional page(s) if applicable) Form F0180 (01-98) is added.” According to St. Paul, the omission of Form F0180 from the policies issued to ESI between 2002 and 2005 was a clerical error by St. Paul. Sullivan admits that Form F0180 was intended to be part of the insurance issued to ESI.
The version of the policy in effect from March 7, 2004 through March 7, 2005 contains an appraisal provision in the event that a claimant and St. Paul disagree about the amount of the loss covered. That provision states:
If your policy provides property or other first-party protection and you and we can’t agree on the amount of the loss covered under the protection, the following procedure will be used to settle the dispute:
1. Either you or we will make a demand for an appraisal of the covered loss amount in dispute.
2. Within 30 days of the demand, you and we will each select a competent and impartial appraiser and notify the other of the selection.
3. The appraisers will select a competent and impartial umpire. If they can’t agree upon an umpire, either of them may request that the selection be made by a judge of a court having jurisdiction.
4. The appraisers will each state separately their appraisal of the covered loss amount in dispute. If they can’t agree on that amount, they’ll submit their appraisals to the umpire. The umpire’s agreement to one of those appraisals will be binding.
5. You’ll pay the fees of your appraiser. We’ll pay the fees of our appraiser. Other costs of the appraisal, including the fees of the umpire will be shared equally by you and us.
When Sun asserted that this appraisal provision did not apply to its claims, St. Paul moved for partial summary judgment on that issue. In a Memorandum of Decision and Order dated July 16, 2007, this Court (van Gestel, J.) ruled that Sun’s claim is subject to the appraisal procedure, but that issues relating to St. Paul’s ultimate liability with respect to coverage would be determined after the appraisal. Judge van Gestel rejected St. Paul’s argument that the appraisal process should be governed by the statutoiy reference procedure set forth in G.L.c. 175, §99, noting that the statute applies only to losses under a fire policy. Sun appealed this decision to a single justice of the Appeals Court (Sikora, J.), who denied the interlocutory appeal on August 9, 2007, rejecting Sun’s argument that appraisal could not proceed before an adjudication of coverage under the policy. In an Order dated August 17, 2007, this Court (van Gestel, J.) again stated that the statutoiy reference process applies only to fire policies, and he ordered that the appraisal proceed as set forth in the policy.
In an Order dated March 5,2008, this Court (Gants, J.) ordered that the appraisal go forward as set forth in the policy, with the umpire resolving any disagreement between the appraisers by selecting one appraisal as his award in a process known as “baseball arbitration.” The court appointed Dr. Michael Cragg as the umpire and stayed all discoveiy pending the umpire’s decision.
Appraiser James Harrington (“Harrington”) filed an appraisal dated May 30, 2008 in which he noted: “[T]he parties agree that the appraisers will appraise *343 Sun’s property loss under the insurance policy’s Appraisal Clause after which the Court will decide the coverage issues.” Harrington defined his task as appraisal of the “amount of the covered loss,” noting, “[gliven that there are legal issues of coverage to be litigated, the ‘covered loss amount’ here might be better described as the appraised loss amount that will be subject to the court deciding the coverage issues.” Property under the policy is insured on an actual cash value basis, such that St. Paul will pay the lesser of “the actual cash value of the lost or damaged property at the time of loss” and the repair or replacements costs of the properly. Harrington sought to identify which of Sun’s property was damaged under the policy language insuring against “risks of direct physical loss or damage.” He stated:
To apply the policy correctly, an appraiser must respect that the policy insures physical damage. The policy does not insure loss of value or perceived trustworthiness. Sun has offered expert materials endorsing its argument that all of the hardware should be considered damaged because Sun does not trust it to perform up to Sun’s standards, but Sun’s concerns do not convert the undamaged hardware into damaged hardware.
In reaching this conclusion, Harrington cited to two published insurance cases. He ultimately adopted St. Paul’s position that the amount of the covered loss under the policy is the value of Sun’s damaged property as documented by testing or inspection. Harrington then appraised the covered loss amount at $512,981. He also answered an appraisal question submitted by Sun which asked the actual cash value, as of the first quarter of 2005, of the portion of the diverted inventory that was placed in the Marlborough warehouse in March and April 2004. He calculated that value to be $1,216,589 before application of the historical factors of excess product, obsolescence and scrapping, and $860,129 after application of the historical factors.
In a June 16, 2008 decision, the umpire selected Harrington’s $512,981 appraisal as determinative of the covered loss amount.
DISCUSSION
Sim urges this Court to vacate the umpire’s decision because Harrington exceeded his authority by making insurance coverage determinations as part of his appraisal. Sun argues that Harrington improperly decided that Form F0180 governs coverage under the policy and interpreted the phrase “risks of direct physical loss or damage” to exclude any intangible loss in the value of equipment that was not shown to have been physically damaged.
St. Paul contends that this Court’s authority to review the umpire’s decision is restricted to the limited grounds set forth in Chapter 251, the Uniform Arbitration Act for Commercial Disputes.[2]
Chapter 251 recognizes the validity and enforceability of “a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties.” G.L.c. 251, §1. This Court concludes that the appraisal provision at issue here does not constitute “arbitration” within the meaning of Chapter 251. See 6 C.J.S. Arbitration §2 (2004) (arbitrator is more than a mere appraiser and functions as a private judge, determining rights and liabilities of parties, while appraiser conducts informal investigation and binds parties to amount of loss determined in particular way). Cf. G.L.c. 175, §10IE; Wilson v. Merrimack Mut. Fire. Ins. Co., 66 Mass.App.Ct. 1102 (2006) (Chapter 251 does not apply to insurance reference proceedings under G.L.c. 175, §99 to determine amount of loss unless the parties so agree in writing).
However, this Court concludes that it is empowered to review the appraiser’s decision to determine whether he exceeded his authority in issuing the appraisal ultimately adopted by the umpire. See, e.g., Wells v. American States Preferred Ins., 919 S.W.2d 679, 683 (Tex.App. 1996) (court may disregard appraisal award made pursuant to terms of insurance contract if award was made without authority or in non-compliance with terms of contract).
No Massachusetts case law directly addresses the authority of an insurance appraiser. However, like an arbitrator, an appraiser’s authority must be limited by and derived from the plain language of the parties’ agreement. See School Committee of Hanover v. Hanover Teachers Ass’n, 435 Mass. 736, 741 (2002) (arbitration). See also Atencio v. U.S. Security Ins. Co., 676 So.2d 489, 490 (Fla.App. 3 Dist. 1996) (appraisal may be required only as to disputes parties expressly agreed to submit). Therefore, an appraiser, like an arbitrator, exceeds his authority by awarding relief beyond the scope of the parties’ agreement or beyond that to which the parties otherwise agreed to be bound. See Superadio Ltd. P’ship v. Winstar Radio Productions, LLC, 446 Mass. 330, 334 (2006) (arbitration).
The party seeking to vacate an appraiser’s decision should bear the burden of proving that the appraiser exceeded his authority. Cf. Fazio v. Employers’ Liab. Assurance Corp. Ltd., 347 Mass. 254, 257 (1964) (arbitration under uninsured motorist insurance statute).
Sun contends that Harrington exceeded the scope of his authority by making a threshold determination that the St. Paul policy’s coverage of “risks of direct physical loss or damage” does not include computer equipment which was stored in the Marlborough warehouse but not proven by testing to be physically damaged. Sun argues that this determination is a legal interpretation of the policy which is the sole province of the court and beyond the appraiser’s authority.
The appraisal provision in the policy applies when St. Paul and the claimant “can’t agree on the amount *344 of the loss covered under the protection” (emphasis added). The appraisal provision thereafter repeatedly refers to the “covered loss amount.” This language suggests that the appraiser’s task necessarily requires him to consider the types of losses covered under the policy. Cf. Rogers v. State Farm Fire & Cas. Co., 984 So.2d 382, 392 (Ala. 2007) (provision referring “amount of loss” to appraiser authorized him only to place dollar value on loss and not to determine cause of damage or other coverage issues); Jefferson Ins. Co. of N.Y. v. Superior Court of Alameda County, 475 P.2d 880, 883 (Cal. 1970) (under provision referring issue of “actual cash value or the amount of loss,” appraisers’ function was only to determine amount of damage relating to items submitted for their consideration, not to resolve questions of coverage or interpret policy); Merrimack Mut. Fire Ins. Co. v. Batts, 59 S.W.3d 142, 149-50 (Tenn.App. 2001) (provision in insurance policy for appraiser to evaluate “amount of loss” empowers appraiser only to place a value on property loss and not to resolve whether insurer is liable under policy).
In addition, although the procedure set forth at G.L.c. 175, §99 does not apply in this case,[3] the limited role of the statutory referees in determining the “amount of loss or damage” suffered by an insured under a fire policy is analogous to the role of the appraiser under the policy at issue here. In the context of statutory reference, the Supreme Judicial Court has stated that:
it is the amount of the loss or damage under the policy which the referees must determine. It is not the amount of loss or damage whether covered by the policy or not... In order intelligently to determine the amount of loss or damage under a given policy, as an incidental step in their deliberations, the referees must reach their own conclusions as to what they think that loss or damage is. Such conclusions must necessarily be affected by what they think the coverage is. Their views so far as ultimate liability goes are wholly tentative and in no sense a decision on that underlying question.
Fox v. Employers’ Fire Ins. Co., 330 Mass. 283, 287-88 (1953). Where there is no dispute about the proper construction of the policy, the referees’ finding is conclusive of the loss as well as the amount, but where the proper interpretation of the policy is in question, the determination of whether the loss is covered remains open for re-examination by the court. Augenstein v. Insurance Co. of North America, 372 Mass. 30, 36-37 (1977); F.C.I. Realty Trust v. Aetna Cas. & Sur. Co., 906 F.Sup. 30, 33 (D.Mass. 1995).
In calculating the “covered loss amount,” Harrington properly considered whether all the computer equipment stored in the Marlborough warehouse was part of the loss “covered under the protection” of the policy issued by St. Paul. Harrington’s determination of the covered loss amount is binding as to that portion of the equipment he included in his calculation. Nonetheless, this Court is not bound by Harrington’s interpretation of the policy language insuring “risks of direct physical loss or damage” to exclude equipment stored in the Marlborough warehouse that was not proven by testing to be physically damaged. That is a policy coverage issue that ultimately must be decided by this Court as a matter of law. Accordingly, the umpire did not exceed his authority in selecting Harrington’s appraisal, and this Court declines to vacate the umpire’s award.
ORDER
For the foregoing reasons, it is hereby ORDERED that Sun’s Motion to Vacate the Umpire’s Decision is DENIED.

Under G.L.c. 251, §12, the court may review an arbitrator’s decision only to determine whether the arbitrator exceeded the scope of his authority or decided the matter based on fraud, bias, corruption, arbitrary conduct, or procedural irregularity. Under Chapter 251, mere error of law or fact by the arbitrator is not a ground for vacating an arbitrator’s decision. Superadio L.P. v. Winstar Radio Productions, LLC, 446 Mass. 330, 336-37 (2006).

Section 99 provides that if the parties fail to agree, “the amount of such loss shall be referred to three disinterested men, the company and the insured each choosing one out of three persons to be named by the other, and the third being selected by the two so chosen; and the award in writing by a majority of the referees shall be conclusive and final upon the parties as the amount of the loss or damage ...” As Sun repeatedly emphasizes, this statutory procedure differs from the baseball arbitration set forth in the St. Paul policy.